1
2
3
4                          UNITED STATES DISTRICT COURT

5                                DISTRICT OF NEVADA

6                                      * * *

7    UNITED STATES OF AMERICA,              )
                                            )      Case No. 2:14-cr-00194-APG-NJK
8                      Plaintiff,           )
                                            )      ORDER AND
9    vs.                                    )      REPORT &  RECOMMENDATION
                                            )
10   GLEN COBB, et al.,                     )
                                            )      (Docket No. 49)
11                     Defendants.          )
                                            )
12   ─────────────────────────────────

13          This matter was referred to the undersigned Magistrate Judge on Defendants' Omnibus

14   Motion.  Docket No. 49.  The Court has considered  Defendants' Motion, Defendants' separately-

15   filed exhibits, the United States' Response, and Defendants' Reply.  Docket Nos. 49, 50, 76. 87.

16          The Court VACATES the previously-set September 26, 2014, hearing.

17   **I.**    **BACKGROUND**

18          On December 6, 2013, during the investigation of this matter, Brett Kressin, a Special Agent

19   (SA) with the Internal Revenue Service, Criminal Investigations (IRS) applied for search warrants

20   for four different locations (the residence of Defendant Glenn Cobb, the residence of Defendants

21   Charles and Anna Cobb, a safe deposit box registered to Defendants Charles and Anna Cobb at the

22   Fremont Hotel and Casino, and a safe deposit box registered to Defendant Namnard at the Fremont

23   Hotel and Casino).  Docket No. 76-1, at 3-43.  The supporting affidavit sets forth substantial detail

24   surrounding the investigation of these Defendants and others.  *Id*.  After review, United States

25   Magistrate Judge Cam Ferenbach issued the search warrants.  *Id*., at 38; Docket No 50, at 73, 79, 87,

26   90.  Law enforcement agents executed the search warrants on December 9, 2013.  Docket No. 49,

27   at 6.

28   . . . .

1      Additionally, on December 6, 2013, SA Kressin applied for seizure warrants for funds in

2 eleven different accounts in the names of Defendants.[1]  The supporting affidavit sets forth substantial

3 detail surrounding the investigation of these Defendants and others.  Docket No. 50, at 46-71.  After

4 review, Judge Ferenbach issued the seizure warrants.  Docket No. 50, at 93, 96, 99, 102, 105, 108,

5 111, 114, 117, 120, 123; Docket No. 49, at 10- 13.  Law enforcement agents executed the seizure

6 warrants on December 9, 2013.  *Id*.

7      On June 3, 2014, Defendants Glen Cobb, Charles Cobb, Anna Cobb and Monica Namnard

8 were indicted .  Docket No. 1.  The two-count Indictment charges Glen Cobb with one count of

9 conducting an illegal gambling business, in violation of Title 18, United States Code, Section 1955,

10 and charges all four defendants with conspiracy to structure transactions to evade reporting

11 requirements, in violation of Title 18, United States Code, Section 371.  The United States also seeks

12 criminal forfeiture of certain property in four separate forfeiture allegations.  *Id*.

13      On July 12, 2014, Defendants filed an omnibus motion, seeking suppression of items seized

14 during the execution of the search warrants and the seizure warrants.  Defendants also seek the return

15 of seized property, as well as the return of some of the seized funds, in order to pay attorney fees.

16 See Docket No. 49.

17 **II.**   **ANALYSIS**

18    **A.**   *Franks* **Hearing**

19      In the first portion of their omnibus motion, Defendants ask the Court to conduct an

20 evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) to determine whether the

21 affidavits submitted in support of the Government's request for the search and seizure warrants were

22

23     [1]These accounts are: (1) any and all funds in a TD Ameritrade account in the name of Defendants Charles and Anna Cobb as trustees for the Cobb Irrevocable Trust; (2) up to $1,000,000 in funds in a TD Ameritrade account in the name of Defendant Glen Cobb as trustee for the Peach Trust; (3) any and all funds in a TD Ameritrade account in the name of Defendant Namnard; (4) any and all funds in a Bank of America account in the name of Defendant Glen Cobb; (5) any and all funds in Cantor Gaming account 9040 in the name of Defendant Glen Cobb; (6) any and all funds in Cantor Gaming account 2073 in the name of Defendant Glen Cobb; (7) any and all funds in Cantor Gaming account 1423 in the name of Defendant Anna Cobb; (8) any and all funds in Cantor Gaming account 9955 in the name of Defendant Anna Cobb; (9) any and all funds in a Cantor Gaming wallet account in the name of Defendant Glen Cobb; (10) any and all funds in a Cantor Gaming wallet account in the name of Defendant Anna Cobb; and (11) any and all funds in a USAA bank account in the name of Defendant Glen Cobb.  Docket No. 50, at 46-47.

sufficient to establish probable cause.  Defendants allege that the supporting affidavits are deficient because they "omitted material facts tending to weigh against probable cause."  Docket No. 49, at 7.  Specifically, Defendants allege that the supporting affidavits discuss in detail incidents where Defendants went to "extraordinary lengths" to structure transactions in an effort to avoid the issuance of Currency Transactions Reports (CTR), which are filed by financial institutions (including casinos) for any cash transaction that exceeds $10,000.  *Id.*, at 16-17.  Defendants claim, however, that the affidavits omit 836 transactions over a course of 13 years in which they engaged that did generate CTRs.  *Id.*, at 17-18.   According to Defendants, the omission of this information renders the affidavit defective and requires suppression of all evidence obtained as a result thereof or, at a minimum, an evidentiary hearing.  *Id.*, at 18.

In opposition, the United States contends that Defendants have not made the requisite showing to entitle them to a *Franks* hearing.  Docket No. 76, at 8.  The United States submits that (1) SA Kressin was not required to list all transactions in his affidavit, but merely the ones that support a finding of probable cause; (2) Defendants provide no evidence that SA Kressin deliberately or recklessly omitted the transactions; and (3) the omissions are not material.  *Id.*, at 9-10.

In reply, Defendants repeat that the CTRs were omitted from the affidavits.  Docket No. 87, at 1-3.  They state that the information about the CTRs is material because it contradicts SA Kressin's theory that Defendants intended to avoid CTRs in the transactions that are listed in the affidavits.  *Id.*, at 3, 5.  Further, Defendants submit that the mere fact that SA Kressin did not devote even a single sentence to the CTRs that were issued "indicates, at a minimum, a reckless disregard for the truth, if not a knowing and intentional effort to mislead the Magistrate Judge."  *Id.*, at 3.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court addressed at length whether a false statement by a government affiant invalidates a search warrant.  *United States v. Hammett*, 236 F.3d 1054, 1058 (9th Cir. 2001) (citation omitted).   The Court held that, under certain circumstances, a defendant is entitled to an evidentiary hearing to afford the defendant an opportunity to attack the veracity of a facially-valid affidavit used to support a search warrant.  A defendant can challenge a facially valid affidavit by making a substantial preliminary showing that "(1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and

1   (2) the affidavit cannot support a finding of probable cause without the allegedly false information."

2   *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (*citing United States v. Stanert,* 762

3   F.2d 775, 780-81 (9th Cir. 1985)).

4          Before a criminal defendant is entitled to go beneath the search warrant to obtain additional

5   information concerning the police investigation and an informant, he or she is required to make a

6   substantial threshold showing.    A defendant's preliminary showing cannot be "merely

7   conclusory."  *Reeves*, 210 F.3d at 1044.  "There must be allegations of deliberate falsehood or

8   reckless disregard for the truth, and these allegations must be accompanied by an offer of proof."

9   *Hammett*, 236 F.3d at 1058 (*quoting Franks*, 438 U.S. at 171).  "To justify a hearing, a defendant

10  must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and

11  accompany such a claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d 1073,

12  1080 (9th Cir. 2008) (citation omitted).  The movant bears the burden of proof and must make a

13  substantial showing to support both elements. *See United States v. Garcia–Cruz*, 978 F.2d 537, 540

14  (9th Cir.1992).

15         Intentional or reckless omissions may provide grounds for a *Franks* hearing.  *United States*

16  *v. Jawara*, 474 F.3d 565 (9th Cir. 2007)); *see also United States v. Stanert*, 762 F.2d 775, 781 (9th

17  Cir. 1985) ("By reporting less than the total story, an affiant can manipulate the inferences a

18  magistrate [judge] will draw.  To allow a magistrate [judge] to be misled in such a manner could

19  denude the probable cause requirement of all real meaning").  Although "[c]lear proof of deliberate

20  or reckless omission is not required," a "[d]efendant 'must offer direct evidence of the affiant's state

21  of mind or inferential evidence that the affiant had obvious reason for omitting facts in order to prove

22  a deliberate falsehood or reckless disregard."  *United States v. Souffront*, 338 F.3d 809, 822-23 (7th

23  Cir. 2003).  A defendant must also show that the "affidavit, once corrected and supplemented,"

24  would not "provide ... a substantial basis for concluding that probable cause existed." *Stanert*, 762

25  F.2d at 782.  "[T]he omission rule does not require an affiant to provide general information about

26  every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief

27  that probable cause existed for the search." *Craighead* 539 F.3d at 1081.

28  . . . .

Here, Defendants have not made a substantial preliminary showing that the omission at issue was done either with intent to make the affidavits misleading or with reckless disregard as to whether the affidavits became misleading as a result of the omission. Defendants have not submitted any sort of offer of proof to show that the omission of information regarding CTRs issued over a 13-year period was done deliberately or with reckless disregard for the truth. Defendants' bare statement in reply that the fact that the information was omitted indicates, in and of itself, a deliberate attempt to mislead or reckless disregard for the truth does not meet the requirements of the applicable caselaw. *See, e.g., Garcia–Cruz*, 978 F.2d at 540.

Additionally, Defendants have failed to show materiality - that the inclusion of the CTR information would negate the probable cause in the affidavits. The probable cause standard for a search warrant is whether, based on common sense considerations, there was "a fair probability that contraband or evidence of a crime [would] be found in a particular place." *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir.1992) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The magistrate judge need not determine "that the evidence is more likely than not to be found where the search takes place.... The magistrate [judge] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir.1991) (citation and internal quotation marks omitted). Neither certainty nor a preponderance of the evidence is required. *United States v. Kelley*, 482 F.3d 1047, 1050–51 (9th Cir. 2007), citing *Illinois v. Gates*, 462 U.S. 213, 246 (1983) and *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) *(en banc)*.

The affidavits set forth numerous transactions that SA Kressin alleged were part of the structuring scheme. Docket No. 50, at 59-62; Docket No. 76-1, at 16-18. The fact that, at other times during a 13-year period, Defendants conducted transactions that complied with the law does not negate the probable cause for the transactions that they allegedly structured in a way to avoid CTRs. The Supreme Court has declined to articulate a "neat set of legal rules" for evaluating probable cause, *id*. at 232, and instead has instructed magistrate judges to determine probable cause by considering the "totality-of-the-circumstances," *Gates*, 462 U.S. at 230. In issuing a search warrant, the magistrate judge simply must determine whether there is a "fair probability" that

1   evidence of a crime will be found.  *Id.*, 462 U.S. at 238, 246.  In looking at the totality of the

2   circumstances, the Court finds that a fair probability existed that evidence of a crime would be

3   discovered in the locations specified in the affidavits.  *See Gates*, 462 U.S. at 230-31.

4           In sum, Defendants have not made a substantial preliminary showing that the affidavits

5   contain material misleading omissions that, if included, would have negated probable cause.

6   Accordingly, the Court finds that a *Franks* hearing is unnecessary, and Defendants' request for a

7   *Franks* hearing is denied.

8           **B.     Motion to Suppress**

9           Defendants submit that the affidavits do not establish probable cause for the searches and

10  seizures.  Docket No. 49, at 19-20.  Defendants contend that the affidavits establish "nothing more

11  than the fact that Defendants are adept gamblers who frequent Las Vegas casinos."  *Id.*, at 20.

12  Defendants urge the Court to find that the affidavits lack probable cause and to therefore suppress

13  all property and assets seized from the searches authorized at issue.  *Id.*  Defendants further contend

14  that the United States overseized assets from the Cobb Irrevocable Trust account and that the amount

15  seized over $4,000,000 should be suppressed.  *Id.*, at 20-21.  Finally, Defendants submit that an error

16  in the seizure affidavit, whereby SA Kressin cites to a statute that does not exist, supports

17  suppression.  *Id.*, at 22-23.

18          In response, the United States contends that SA Kressin is an experienced agent with

19  extensive training in financial investigation, who "is very familiar with the operations of illegal

20  gambling schemes and has participated in investigations of such schemes in the past."  Docket No.

21  76, at 10-11.  The United States submits that the affidavits provide probable cause for the searches

22  and seizures with the information regarding the use of chips in place of cash, the history of

23  structuring transactions to avoid the issuance of CTRs and Defendant Glen Cobb's "connection to

24  illegal gambling networks and his gambling history."  *Id.*, at 11.  The United States points out that

25  SA Kressin also had information from a cooperating witness who provided information regarding

26  Defendant Glen Cobb's activities, and that the Court is entitled to rely on SA Kressin's training,

27  experience and professional determinations regarding Defendants' activities in determining that

28  probable cause existed.  *Id.*  Regarding Defendants' argument about material defects in the seizure

1    warrant affidavit, the United States concedes that paragraph 3, subsections k, l, m and n each contain

2    the same typographical error - specifically, these subsections refer to 18 U.S.C. § 1957(c)(7)(A)

3    rather than 18 U.S.C. §1956 (c)(7)(A).  *Id.*, at 12.  The United States contends, however, that the

4    typographical error does not render the affidavit defective, and points out that Defendants even admit

5    in their motion that they assumed SA Kressin intended to cite to 18 U.S.C. § 1956(c)(7)(A), and that

6    Defendants cite no caselaw that supports their contention that the affidavit is defective due to the

7    typographical error.  *Id.*, at 12-13, n. 5; Docket No. 49, at 22.  Finally, the United States submits that,

8    even if the Court were to find that probable cause did not exist, the good faith exception applies and

9    the Court should therefore not exclude the evidence seized.  Docket No. 76, at 11-12.

10        In reply, Defendants submit that the United States' response "illustrates a fundamental lack

11   of understanding of professional sports wagering."  Docket No. 87, at 6.  Defendants further contend

12   that the affidavits contain vague, unsupported facts.  *Id.*, at 6-7.  Defendants submit, for the first time

13   in reply, that SA Kressin inappropriately relies on double and triple hearsay, and that the cooperating

14   witness has no experience with gambling and has a motive (as Defendant Glen Cobb's wife's

15   purported "long-time confidant") to cause criminal trouble for Defendant Glen Cobb.  *Id.*, at 8-11.

16   Defendants further state for the first time in reply that SA Kressin's reliance upon the cooperating

17   witness' information reflects "a deliberate, or at best reckless, attempt to rely on an unverified,

18   uncorroborated, unknowledgeable informant with a motive to falsify the truth."  *Id.*, at 12.

19   Defendants contend that, though they do not concede probable cause for the seizure of any funds

20   from the Cobb Irrevocable Trust Account, the amount above $4,000,000 must be suppressed, as the

21   affidavit does not in any case provide for the seizure of more that $4,000,000 from that account.  *Id.*,

22   at 13-14.  Finally, Defendants contend that the good faith exception does not apply in the instant

23   matter.  *Id.*, at 12-13.

24        Probable cause is "a fluid concept turning on the assessment of probabilities and the

25   particular factual context not readily, or even usefully, reduced to a neat set of legal rules," and its

26   existence must be determined by an analysis of the totality of the circumstances surrounding the

27   intrusion.  *Gates*, 462 U.S. at 232.  Probable cause does not deal with hard certainties, but with

28   probabilities.  *Id.* at 241; *see also Brinegar v. United States*, 338 U.S. 160, 175 (1949) (Probable

1   cause deals with "probabilities" which are not technical, but factual and practical considerations of

2   everyday life on which reasonable and prudent people, not legal technicians act).   As noted above,

3   the Supreme Court defines probable cause to search as "a fair probability that contraband or evidence

4   of a crime will be found in a particular place." *Gates,* 462 U.S. at 238.  *Gates* makes clear that the

5   determination of probable cause is made by examining the "totality of the circumstances." *Id*.  The

6   United States Supreme Court has repeatedly emphasized that the probable cause standard is a

7   "practical, non-technical conception." *Brinegar,* 338 U.S. at 175.

8        The *Gates* decision made it clear that a magistrate judge's decision regarding probable cause

9   should be given great deference.  The duty of a reviewing court is to insure that the magistrate judge

10   had a substantial basis for concluding that probable cause existed.  A reviewing court is required to

11   examine all circumstances set forth in the affidavit, and in doubtful cases, to give preference to the

12   validity of the warrant. *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir.), *cert. denied*, 474

13   U.S. 847 (1985).

14        It is well recognized that law enforcement officers can rely on their own experience and the

15   experience and information of other law enforcement officers in establishing probable cause. *United*

16   *States v. Butler*, 74 F.3d 916 (9th Cir. 1996).   Similarly, "a magistrate [judge] may rely on the

17   conclusion of experienced law enforcement officers regarding where evidence of a crime is likely

18   to be found." *United States v. Fannin*, 817 F.2d 1379, 1381 (9th Cir. 1987). *See also United States*

19   *v. Ayers*, 924 F.2d 1468, 1479 (9th Cir. 1991) ("in weighing the evidence supporting a request for

20   a search warrant, a magistrate [judge] may rely on the conclusions of experienced law enforcement

21   officers regarding where evidence of a crime is likely to be found.")  An officer need not include *all*

22   of the information in his possession to obtain a search warrant.  An affidavit need only show facts

23   adequate to support the finding of probable cause. *United States v. Johns*, 948 F.2d 599, 605 (9th

24   Cir. 1991).

25        The search warrant affidavit states that probable cause exists to believe that Defendant Glen

26   Cobb has committed or is committing the crimes of Structuring of Transactions to Avoid Currency

27   Reporting Requirements, in violation of 31 U.S.C. § 5324; Transmission of Wagering Information,

28   in violation of 18 U.S.C. § 1084; Illegal Gambling, in violation of 18 U.S.C. § 1955; Money

Laundering, in violation of 18 U.S.C. §§ 1956 and 1957; and Conspiracy, in violation of 18 U.S.C. § 371, and that probable cause exists to believe that evidence of those crimes will be found at the places to be searched.  Docket No. 76-1, at 5.  The seizure warrant affidavit states that probable cause exists to believe that the funds to be seized constitute, or are derived from, proceeds traceable to numerous federal and state crimes, and that the funds are subject to forfeiture.  Docket No. 50, at 47-50.  Both affidavits also describe relevant federal and Nevada gaming statutes that apply to the case, including that "it is illegal for individuals to operate unlicensed gambling operations in the State of Nevada.  GLEN has no such license in the State of Nevada.  Individuals are also prohibited by State law from accepting wagers from other individuals whether inside or outside of the State of Nevada."  Docket No. 76-1, at 6-8; Docket No. 50, at 51-52.

The affidavits discuss, as background information, a 2002 investigation into the Cobbs' banking activity, including an IRS agent's interview of Defendants Charles and Anna Cobb "regarding their practice of structuring cash deposits into bank accounts," and during which interview, both Cobbs told agents that the source of their cash deposits was their son Glen's business, in which they both participated.  Docket No. 76-1, at 8; Docket No. 50, at 53.  Defendant Anna Cobb refused to answer any questions about the origin of the case, or the type of business in which Defendant Glen Cobb was involved.  Docket No. 76-1, at 8-9; Docket No. 50, at 53.  During this interview, agents clearly explained to Defendants Anna and Charles Cobb that "it is unlawful to structure deposits in order to avoid the filing of CTRs."  Docket No. 76-1, at 9; Docket No. 50, at 53-54.  The affidavits state that Defendant Glen Cobb called agents later that same day, told them that he was a professional gambler and that gambling was his only employment.  Defendant Glen Cobb also admitted that he structures his deposits, and agents explained to him that structuring violates the law.  Docket No. 76-1, at 9; Docket No. 50, at 54.

The affidavits also discuss, as background information, a May 2011 illegal gambling investigation located in New York with major branches in other states, including Nevada.  Docket No. 76-1, at 9; Docket No. 50, at 54.  The affidavits state that Defendant Glen Cobb was an acquaintance, if ot a possible associate, of one of the people arrested in that investigation.  Docket No. 76-1, at 9-11; Docket No. 50, at 54-56.  The affidavits describe off-shore sports books, how they

1   operate in a way to circumvent the law and accept wages from bettors within the United States, as

2   well as the practice of laying off bets, and how it appears that Defendant Glen Cobb's "large

3   wagering at Las Vegas casino sports books is done for the purpose of placing layoff bets for off shore

4   sports books." Docket No. 76-1, at 10-11; Docket No. 50, at 55-56.

5         The affidavits describe, in detail, the surveillance conducted of Defendants between April

6   2012 and November 2013 and how it shows a connection between Defendant Glen Cobb and

7   Pinnacle, an offshore sports wagering website. SA Kressin states that the surveillance also shows

8   that Defendant Glen Cobb's bookmaking organization "is involved in a complicated scheme of

9   placing bets and collecting winnings to avoid reporting requirements." This surveillance includes

10  Defendants gambling at different casinos, and arriving and departing premises to be searched.[2]

11  Docket No. 76-1, at 11-13; Docket No. 50, at 56-57.

12        The affidavits discuss information given to Federal Bureau of Investigation (FBI) SA Thayne

13  Larson by a cooperating witness (CW-1) in 2013. CW-1 says that Defendant Glen Cobb receives

14  the money he bets at casinos from outside the United States, and that he made millions of dollars per

15  year doing so. Among others, Defendants Namnard and Anna and Charles Cobb are a part of

16  Defendant Glen Cobb's operation. CW-1 says that Defendant Glen Cobb initially operated his

17  illegal gambling operation out of his residence, but moved it to the residence of Defendants Anna

18  and Charles Cobb in March or April 2013. CW-1 states that Defendant Glen Cobb uses at least four

19  different mobile telephones for bookmaking; that he uses mobile betting devices and his computer

20  if he cannot get to a casino; that he has no credit cards; that he frequently changes his mobile

21  telephone numbers because he is nervous about being monitored by law enforcement; that he stores

22  large amounts of cash at home and has multiple concealed safes at both his and his parents'

23  residences; and that he has accounts at USAA and TD Ameritrade containing millions of dollars.

24  Docket No. 76-1, at 13-15; Docket No. 50, at 57-59.

25        The affidavits state that, according to casino records, Defendant Glen Cobb regularly receives

26

27      [2]The premises for which the search warrants were obtained are Defendant Glen Cobb's residence; the residence of Defendants Charles and Anna Cobb; a safe deposit box registered to Defendants Anna and Charles Cobb at the Fremont Hotel and Casino; and a safe deposit box

28  registered to Defendant Namnard at the Fremont Hotel and Casino. Docket No. 76-1, at 4-5.

chips instead of cash for wager redemptions and that, based on SA Kressin's experience, groups like these defendants "will use casino chips as a method of payment for settling of accounts. It is very likely that these chips were passed to others either to redeem or as payment on accounts. Casinos are not able to track with 100% certainty that the player redeeming the chips is the same one who received the chips from the casinos." Docket No. 76-1, at 15; Docket No. 50, at 59. The affidavits state that SA Kressing has identified structured transactions by Defendant Glen Cobb and his associates dating back to January 2008, and that a review of each defendant's gambling history indicates that each defendant has conducted hundreds of thousands of dollars in structured redemptions. The affidavits list some transactions of each defendant that law enforcement believes are part of their structuring scheme. Docket No. 76-1, at 15-18; Docket No. 50, at 59-62.

   The search warrant affidavit discusses Defendant Namnard's safe deposit box at Fremont Casino, which was opened in her name on June 3, 2011. Docket No. 76-1, at 18. The affidavit states that Defendant Namnard has accessed the safe deposit numerous times, including on at least two dates in which she made structured redemptions at the Fremont. *Id*. The affidavit also discusses a safe deposit box at the Fremont that is registered to Defendants Anna and Charles Cobb. *Id*. The affidavit states that Anna and/or Charles accessed this box "several times during the period in which they were structuring chip redemptions." *Id*., at 19.

   Both affidavits discuss Cantor Gaming, and describe it as a "licensed sports book betting company that uses account based wagering." *Id*.; Docket No. 50, at 62. The affidavits summarize recent activity in the Cantor Gaming Wallet accounts of Defendants Glen and Anna Cobb. Docket No. 76-1, at 19-22; Docket No. 50, at 62-65. The affidavits then list several deposits from local casinos and sports betting companies into Defendant Glen Cobb's USAA bank accounts. Docket No. 76-1, at 22-23; Docket No. 50, at 65-66. The affidavits list transfers from Defendant Glen Cobb's USAA account to TD Ameritrade Accounts controlled by defendants. Docket No. 76-1, at 23-24; Docket No. 50, at 66-67. The seizure affidavit also include a summary of deposits and withdrawals to the Bank of America accounts of Defendants Glen, Anna and Charles Cobb that SA

1    Kressin believes are part of the structuring scheme.  Docket No. 50, at 67.[3]

2          The search warrant affidavit states that Defendants Anna and Charles Cobb are retired and

3    that, based on their 2002 admission and their current actions, law enforcement believes they still

4    participate in Defendant Glen Cobb's gambling operation.  Docket No. 76-1, at 28.  Additionally,

5    the affidavit states that law enforcement is unaware of any employment or other sources of income

6    for Defendant Glen Cobb or Defendant Namnard.  *Id*.

7          Reviewing the affidavits as a whole, applying the totality of the circumstances test, and

8    showing the issuing judge great deference as the United States Supreme Court mandates, this court

9    finds that the issuing judge had a substantial basis for concluding that probable cause existed for

10   issuance of these warrants.  As the Supreme Court in *Gates* recognized "only the probability, and

11   not a prima facie showing of criminal activity, is the standard of probable cause."  462 U.S. at 235.

12   The evidence presented to Judge Ferenbach, taken as a whole, established the probability that

13   evidence of illegal activity would be found in the premises sought to be searched in the at-issue

14   search warrants and the accounts sought to be seized in the at-issue seizure warrants,[4] based on

15   factual and practical considerations of everyday life on which reasonable and prudent people act.[5]

16   Accordingly, the Court finds that the search and seizure warrants at issue were supported by probable

17   cause.

18          **C.    Seizure from Cobb Irrevocable Trust Account**

19          Defendants submit that, even if the Court finds probable cause existed for the search and

20   seizure warrants, the United States seized funds from the Cobb Irrevocable Trust Account in excess

21   _____

22          [3]The search warrant affidavit contains more statements relevant to probable cause, including
     some of SA Kressin's knowledge, based on his training and experience, about those involved in
23   illegal gambling activity.  Docket No. 76-1, at 24-28.  It also contains more information linking
     defendants to the premises to be searched.  *Id*.

24          [4]Defendants cite no authority, in this Circuit or otherwise, in support of their argument that
     the typographical error in the seizure warrants (wherein SA Kressin cited to a subsection of 18
25   U.S.C. § 1957 rather than to a subsection of 18 U.S.C. § 1956) renders the warrants defective and
     discredits any finding of probable cause.  Docket No. 49, at 22-23.  The Court therefore also denies
26   that portion of their request.  *See* LCR 47-9.

27          [5]Since the Court has determined that probable cause existed for the issuance of the search and
     seizure warrants, the Court does not reach the parties' good faith exception arguments.  *See United*
28   *States v. Leon*, 468 U.S. 897 (1984).

of the funds that it could show had a traceable connection to illegal activity. Docket No. 49, at 20.

Defendants state that the affidavit alleged that $4 million in that account was involved in criminal

activity, but that the United States seized a significantly greater amount from the account:

$7,726,575.12. *Id.*, at 20-21. Defendants further state that the United States has "on at least two

occasions - conceded that it overseized funds" from the Cobb Irrevocable Trust Account, but then

included the entire amount in the forfeiture allegation in the criminal indictment. *Id.*, at 22.

Therefore, Defendants submit, the Court should suppress the amount seized over $4 million. *Id.*[6]

In response, the United States submits that the warrant "authorized the seizure and forfeiture

of 'any and all funds' in the Cobb Irrevocable Trust that were used in conducting the illegal

gambling business or constituted or were derived from proceeds from that business." Docket No.

76, at 13. *See also* Docket No. 50, at 68. The United States contends that all funds seized from that

account were properly seized and forfeited. Docket No. 76, at 13. The United States submits that

Paragraph 40 of the seizure warrant affidavit does not provide a maximum amount that may be

seized from the account. Instead, the $4 million in transactions cited in the affidavit provides

probable cause to seize the funds in the account that represent the proceeds of the alleged illegal

gambling operation. *Id.*, at 14; Docket No. 50, at 66. The United States breaks down the additional

money (over the $4 million described in the affidavit) in the account as follows: "$1,912,000 was

deposited in the Cobb Irrevocable Trust account in the form of two deposits from Glen Cobb's other

TD Ameritrade account, bringing the total deposits to $5,912,000;" and the "remaining

$1,814,575.12 in the Cobb Irrevocable Trust account is attributable to appreciation of the account

through interest and dividends or from gains on the stock." Docket No. 76, at 15. The United States

further submits, in support of its contention that the funds are traceable to illegal activity, that

Defendant Glen Cobb's sole source of income is his bookmaking operation; that law enforcement

could find no indication of employment or other sources of income for him, or for Defendant

---

[6]Defendants also state that the Court should order the United States to produce the transcript of the grand jury proceedings in the instant case. This argument was fully developed in Defendants' separate motion for transcription of grand jury minutes (Docket No. 101), and fully briefed by the parties. On September 9, 2014, the Court denied Defendants' motion for transcription of grand jury minutes. Docket No. 116.

1   Namnard; that Defendants Charles and Anna Cobb are retired; and that no other known source exists

2   for the large funds used by Defendants for gambling.  *Id*.

3           In reply, Defendants state that, despite the fact that the two deposits totaling $1,912,000

4   "were made well before the purported structuring activities" detailed in the affidavit supporting the

5   seizure warrants, nothing in the affidavit "even hints" that any of the funds exceeding $4 million in

6   the Cobb Irrevocable Trust account "had even the slightest connection to any untoward activities."

7   Docket No. 87, at 14.  Defendants challenge the United States' contention that they had no other

8   source of income, by stating that their tax returns reflect that they "wager millions of dollars each

9   year at Las Vegas sports books."  *Id*.  Defendants contend that the cooperating witness from whom

10  SA Kressin obtained information lacked understanding of Defendants' gambling business and

11  "intentionally" misrepresented her knowledge to another special agent.  *Id*., at 14-15.[7]

12          The seizure affidavit clearly shows probable cause to believe that defendants are engaged in

13  illegal gambling.  Any property, including money, traceable to that offense, "may be seized and

14  forfeited to the United States."  18 U.S.C. § 1955(d).  See also 18 U.S.C. § 981(a)(1)(A).  The United

15  States has submitted proof that the total deposit into the Cobb Irrevocable Trust account of

16  $1,912,000, over and above the $4 million listed in the seizure warrant affidavit, came from

17  Defendant Glen Cobb's funds.  *See* Docket No. 76-2.  The remaining amount in that account is, as

18  stated by the United States and undisputed by Defendants, attributable to appreciation of the account.

19          The United States has submitted that all of Defendant Glen Cobb's money comes from his

20  illegal gambling operation.  Defendant Cobb disputes that his business is illegal, but agrees that his

21  money comes from that business.  Further, the warrant itself allowed seizure of any and all funds in

22  the Cobb Irrevocable Trust account, not simply the $4 million listed in the transfer from Defendant

23  Cobb's USAA bank account section.  The Court therefore finds that probable cause exists for the

24  seizure of all funds in the Cobb Irrevocable Trust account, and that no funds should be suppressed.

25  . . . .

26  _____

27          [7]In support of their claim that the witness misrepresented her knowledge, Defendants state
    that the witness told the agent that Defendant Glen Cobb did not have a job and did not file tax
    returns, but e-mail the agent the tax returns from Defendant Glen Cobb's gambling business on the
28  same day.  Docket No. 87, at 15.

1    **D.    Motion for Return of Seized Property**

2       Defendants request the return of all property seized under the search and seizure warrants,

3    pursuant to Fed.R.Crim.P. 41.  Docket No. 49, at 23-24.  In support of their request, Defendants

4    submit that the property was illegally seized.  *Id.*, at 24.  Defendants also make a bare claim that

5    return of property is "reasonable under the circumstances." *Id.*, at 24.

6       In response, the United States submits that the search and seizures were valid and lawful, and

7    that the property seized is connected to illegal activity; therefore, no basis for return of property

8    exists.  Docket No. 76, at 16-17.  In reply, Defendants reiterate their contention that the property

9    should be returned because it was illegally seized.  Docket No. 87, at 15.

10      Federal Rule of Criminal Procedure 41(g) states, in relevant part, that a person "aggrieved

11   by an unlawful search and seizure of property... may move for the property's return." Rule 41(g)

12   motions may be made at any time following a search and seizure.  If the motion is made after an

13   indictment is issued, the motion to return property is treated as a motion to suppress in the criminal

14   prosecution. *See United States v. Mills*, 991 F.2d 609, 612 (9th Cir. 1993) (internal citation omitted).

15   Generally, a Rule 41(g) motion is properly denied "if the defendant is not entitled to lawful

16   possession of the seized property, the property is contraband or subject to forfeiture or the

17   government's need for the property as evidence continues." *United States v. Van Cauwenberghe*,

18   934 F.2d 1048, 1061 (9th Cir.1991).

19      Defendants' basis for requesting return of property is that all of the property and funds were

20   illegally seized.  After carefully reviewing all the evidence presented, the Court has determined that

21   probable cause existed for the issuance of the search and seizure warrants.  Therefore, the searches

22   and seizures were lawful, and the motion for return of property should be denied on that basis.

23      The Court notes that Fed.R.Crim.P. 41(g) would allow the return of property lawfully seized

24   under certain circumstances.[8] *See United States v. Comprehensive Drug Testing Inc.*, 621 F.3d 1162,

25

26   _____

       [8]The Court engages in this analysis despite the fact that Defendants dropped all arguments on this issue in reply other than their argument that the property and funds were illegally seized. Docket No. 87, at 15.  *See United States v. McEnry*, 659 F.3d 893, 902 (9th Cir. 2011) (where an argument is available but not raised, it is waived); *Hansen v. Long*, 2014 WL 3435871, *14 (C.D. Cal. Jan. 28, 2014) (failure to address argument in reply is a concession that the argument is correct), *adopted* 2014 WL 3436156 (C.D. Cal. July 10, 2014).

27

28

1173 (9th Cir. 2010) (movant need not establish an unlawful search to request return of property no longer needed for the government's investigation).  As stated by Defendants, "if the property is no longer needed for evidentiary purposes, the burden shifts to the Government to show a legitimate interest in retaining the property."  Docket No. 49, at 24 (citing *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1061 (9th Cir. 1991).  The court therefore must consider whether the "United States' legitimate interests can be satisfied even if the property is returned" and therefore, it would be unreasonable for the United States to retain the property.  *Ramsden v. United States*, 2 F.3d 322, 326 (9th Cir.1993).  Here, Defendants filed their motion post-indictment and the indictment includes forfeiture allegations.  It is well-settled that the Government may defeat a Rule 41(g) motion by demonstrating that the property is subject to federal forfeiture.  *See United States v. Fitzen*, 80 F.3d 387, 389 (9th Cir.1996).  Therefore, the Court finds that the seized property and assets should not be returned pursuant to Rule 41(g), and that Defendants' motion should be denied.

###### E.    Motion for Return of Seized Funds to Pay Legal Fees

Defendants ask the Court to order the United States to return a "reasonable" portion of the funds seized so that Defendants can use these funds to pay their legal fees.  Docket No. 49, at 25. In support of their request, Defendants claim that their ability to defend themselves has been hampered by the seizure of their funds; that Defendant Namnard has no funds to pay legal fees; and that the other Defendants have been left solely with trust funds, of which Defendant Glen Cobb is but one of the beneficiaries.  Docket No. 49, at 24.  In support of their request, Defendants cite to only one case, *United States v. Monsanto*, 491 U.S. 600 (1989).

In response, the United States submits that Defendants have "failed to identify any legitimate hardship that would warrant the return of the seized funds."  Docket No. 76, at 17.  The United States contends that Defendants' Sixth Amendment right to retain the attorney of their choice is not absolute if, for example, they cannot afford to hire that attorney.  *Id*.  Further, the United States contends that Defendants retained approximately $4 million in one of their TD Ameritrade accounts when their funds were seized, thus showing that Defendants possess adequate funds with which to pay counsel.  *Id*., at 17-18.

In reply, Defendants reiterate that their ability to further their defense has been greatly

hampered by the seizure of funds.  Docket No. 87, at 15.  Defendants submit that the $4 million in the TD Ameritrade account are "dedicated to the children of Glen Cobb and Chaluay Namnard," and that "Glenn Cobb is just one of three beneficiaries of the Cobb Irrevocable Trust."  *Id.*, at 16. Defendants again request return of a "reasonable" portion of the funds seized from their accounts in order to pay legal fees.  *Id.*

The Supreme Court has recognized a qualified right to counsel of choice for criminal defendants pursuant to the Sixth Amendment.  *Powell v. Alabama*, 287 U.S. 45, 53 (1932).  Further, the Ninth Circuit has found that denial of the qualified right to counsel of choice is reversible error. *United States v. Ray*, 731 F.2d 1361, 1365 (9th Cir.1984).  Nevertheless, the Supreme Court has found "a strong governmental interest in obtaining full recovery of all forfeitable assets," which "overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Caplin & Drysdale v. United States*, 491 U.S. 617, 631 (1989).  As such, the forfeiture of illicit proceeds or other assets utilized to facilitate criminal activity that would otherwise be used to pay attorney fees does not violate a criminal defendant's qualified right to counsel of choice embodied in the Sixth Amendment and Due Process Clause of the Fifth Amendment. *Id.*; *see also Monsanto*, 491 U.S. at 615.  "A defendant has no Sixth Amendment right to spend another person's money for legal fees - even if that is the only way to hire a preferred lawyer." *Kaley v. United States*, 134 S.Ct. 1090, 1096 (2014) (citing *Caplin & Drysdale*, 491 U.S. at 626). *See also Monsanto*, 491 U.S. at 614.

The United States "does not violate the Constitution if, pursuant to the forfeiture statute, it seizes the [funds traceable to a criminal act] and refuses to permit the defendant to use them to pay for his lawyer." *Kaley*, 134 S.Ct. at 1096 (internal citation omitted).[9]  Even prior to conviction, when the presumption of innocence still applies, the Government can constitutionally freeze assets of an indicted defendant based on a finding of probable cause to believe that the property will ultimately be proved forfeitable, and a grand jury indictment constitutes such probable cause.  *Id.*, at 1096-

---

[9]*Kaley* further provides that such restraint on assets does not deprive a criminal defendant of representation that would ensure fair proceedings.  "The Sixth Amendment would require the appointment of effective counsel if [Defendants] were unable to hire a lawyer." *Kaley*, 134 S.Ct. at 1102, n. 13.

1   1097.  *See also Gerstein v. Pugh*, 420 U.S. 103, 117, n. 19 (1975) (probable cause finding by grand

2   jury sufficient to initiate prosecution is conclusive).

3         Here, the grand jury has returned an indictment with three forfeiture allegations, including

4   the funds seized from Defendants' accounts.  *See* Docket No. 1.  This indictment conclusively

5   determines probable cause to believe the property "will ultimately be proved forfeitable."  *Kaley*, 134

6   S.Ct. at 1096-1097*, citing *Monsanto*, 491 U.S. at 615.  *See also Costello v. United States*, 350 U.S.

7   359, 362 (1956) (indictment fair upon its face, returned by properly constituted grand jury

8   conclusively determines probable cause).  Therefore, Defendants may not use the funds subject to

9   forfeiture to pay attorney fees.  *See Kaley*, 134 S.Ct. at 1096 ("[s]ometimes "a defendant will be

10  unable to retain the attorney of his choice if he cannot use forfeitable assets," but such situation does

11  not violate a defendant's Constitutional rights); *Caplin & Drysdale*, 491 U.S. at 626 (criminal

12  defendant has no Sixth Amendment right to spend another person's money for legal fees, even if that

13  is only way to hire preferred lawyer, and funds subject to forfeiture do not belong to defendant).

14  Accordingly, Defendants' request for return of funds to pay attorney fees should be denied.[10]

15                                       **ORDER**

16        Based on the foregoing and good cause appearing therefore,

17        IT IS HEREBY ORDERED that Defendants' request for a *Franks* hearing is **DENIED**.

18        IT IS FURTHER ORDERED that the oral argument on Defendants' request for suppression

19  of seized funds set for September 26, 2014, is **VACATED**.

20

21        [10]Additionally, Defendants fail to make any showing whatsoever as to what constitutes a
reasonable amount for attorney fees, what the attorney fees are in this case, and Defendants' financial
22  situation.  The cases that allow a defendant a *Monsanto* hearing on this issue (although the Court
notes that a *Monsanto* hearing has not been requested on this issue in this case) require a defendant
23  to provide sufficient evidence to make a threshold showing that seized assets are needed to pay for
counsel of choice before a defendant is entitled to a hearing. *Monsanto*, 491 U.S. at 600; *United States
24  v. Unimex, Inc.*, 991 F.2d 546 (9th Cir. 1993 (in deciding whether to grant hearing, court must decide
whether the moving papers filed, including affidavits, are sufficiently definite, specific, detailed and
25  nonconjectural to enable court to conclude that substantial claim presented). *See also United States
v. Jones*, 160 F.3d 641 (10th Cir. 1998) defendant may not simply ask for hearing, but must first
26  demonstrate has no unrestrained assets to pay private counsel).

27        Here, Defendants have made no attempt to show that they have no unrestrained assets to pay
private counsel.  They have made bare statements, but have failed to present affidavits, or any other
28  type of proof, regarding their financial situation.

- 18 -

1

## **RECOMMENDATION**

2      Based on the foregoing and good cause appearing therefore,

3      IT IS RECOMMENDED that Defendants' Motion to Suppress be **DENIED**.

4      IT IS FURTHER RECOMMENDED that Defendants' Motion to Suppress Amount Seized

5 Over $4 Million from Cobb Irrevocable Trust be **DENIED**.

6      IT IS FURTHER RECOMMENDED that Defendants' Motion for Return of Seized Property

7 be **DENIED**.

8      IT IS FURTHER RECOMMENDED that Defendants' Motion for Return of Seized Funds

9 to Pay Attorneys' Fees be **DENIED**.

10

## **NOTICE**

11      Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must**

12 **be in writing and filed with the Clerk of the Court within 14 days of service of this document.**

13 The Supreme Court has held that the courts of appeal may determine that an appeal has been waived

14 due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142

15 (1985).  This Circuit has also held that (1) failure to file objections within the specified time and (2)

16 failure to properly address and brief the objectionable issues waives the right to appeal the District

17 Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst*, 951

18 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir.

19 1983).

20      DATED this 23rd day of September, 2014.

21

22

23

24                                                NANCY J. KOPPE
                                                 United States Magistrate Judge

25

26

27

28

- 19 -